# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO. 5:13-CV-00100-DSC

| | |
|---|---|
| EMNEDIN OMANOVIC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND ORDER** |
| ) | |
| TYSON FOODS, INC. AND ) | |
| TYSON SHARED SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on "Defendants' Motion for Summary Judgment" (Doc. 34), as well as the parties' associated briefs, affidavits, and exhibits. See Docs. 35, 38, and 39.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this Motion is now ripe for the Court's determination.

Having carefully considered the parties' arguments, the record, and the applicable authorities, the Court grants Defendants' Motion for Summary Judgment, as discussed below.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a Bosnian Muslim who immigrated to the United States in 1999. He worked part-time for Tyson's Wilkesboro, North Carolina laboratory in 2000 and voluntarily resigned in January 2001 to pursue other opportunities. He was re-hired in a full-time capacity on June 6, 2005 as a Chemist/Microbiologist. Plaintiff was an at-will, non-management employee throughout his tenure.

On June 6, 2005, Plaintiff signed an acknowledgement of receipt of Defendants' policy against harassment.  Plaintiff was aware of Defendants' "Harassment and Discrimination" policy throughout his employment.  It provides that the company "will maintain a strict policy prohibiting any kind of unlawful harassment, such as that involving . . . sex . . .  This policy prohibits harassment in any form, including verbal, written, visual or physical harassment." Doc. 35-1 at 77.  It defines harassment as "unwelcome conduct, whether explicit or implied, verbal or non-verbal, which . . . creates a hostile work environment, or diminishes the dignity of any person." Id.  Plaintiff signed additional acknowledgements of this policy throughout his employment and received annual electronic and in-person training.  He also reviewed the policy on the employee bulletin board at the laboratory.

Tyson also had a policy in effect during Plaintiff's employment entitled "Cameras, Recording Devices and Cellular Phones Policy 269."  This policy provides that in all "non-production areas," "personal cellular phones are permissible during non-scheduled work times." Id. at 87.  Section 2.3 of the policy warns that "[w]hat is not permissible in these areas is the use of any recording device that has picture or video capability. Anyone found to have violated the picture or video provision of the policy will be subject to suspension and/or termination." Id. The policy prohibits employees from taking photographs on any company property, including exterior areas.  The only exception to this policy is contained in section 2.4.1 for those who are "authorized Tyson representatives." Id.

Laboratory Manager Joel Laster granted Plaintiff a leave of absence for a trip to Europe. Plaintiff departed on July 4, 2011, and believes he reported back to work within a week of his August 26, 2011 return to the United States.

Susan Darnell was a non-management employee of Defendants at the laboratory when Plaintiff was rehired in June 2005. On August 26, 2011, before Plaintiff's return from Europe, Darnell complained to Laster about photographs Plaintiff had taken of her at the facility's exterior break area in June 2011. Darnell reported that Plaintiff took a picture of her chest that did not include her face. She also reported that Plaintiff held his camera phone under a picnic table and photographed her crotch.

On August 31, 2011, Darnell reported to Laster that Plaintiff tried to hug and kiss her multiple times. She stated that Plaintiff kissed her on the cheek over her objections, and held his hand behind her buttocks, telling her that he was going to "pat her on the bottom." Doc. 35-4 at 9. She stated that his actions "made me very uncomfortable" and that after the photographs she felt "not simply uncomfortable, but violated." Id.

Complex Human Resources Manager Brent West was assigned to investigate Darnell's allegations. On September 14, 2011, West and Laster interviewed Plaintiff. This was the first time West had ever met Plaintiff. Plaintiff provided a written statement confirming that he took photographs of co-workers at the picnic table during late May to June 2011. He wrote that he accidentally took a photograph that displayed his own legs. Plaintiff admitted that Darnell did not give him permission to take her photograph, was upset and angry with him for taking the photograph, and asked him what he was going to do with the photograph. Doc. 35-1 at 44-46. Plaintiff received a written suspension notice pending the outcome of the investigation. Id. at 57-58.

On September 15, 2011, West interviewed Darnell. Darnell made similar allegations to West as she had made to Laster.

On September 16, 2011, Paula Bumgarner told West and supervisor Kathleen Miller that Plaintiff "made me feel uncomfortable in the workplace." Doc. 34-6 at 1. She stated that while walking in the laboratory hallway with her hands full, Plaintiff leaned in and tried to kiss her. She told them that "Mr. Omanovic's attempt to kiss me in the workplace was not as a friend or a relative, but rather I took it as him trying to kiss me in a romantic way. I am five feet three inches tall and would estimate he is approximately five feet ten inches tall. He leaned in and was only about six inches from my lips. I said 'Whoa! That's not okay!' and backed away. I told him he made me feel uncomfortable. He seemed irritated with me after that." Id. at 2.

Laster and West interviewed additional employees including Wanda Collins, Kristyn Jackson, Sharon Goad, Beverly Prevette, and Kathy Dilliard. They provided varying reports about the photograph Plaintiff took under the picnic table, including that it showed a woman's knee caps, the middle of a woman's legs, and a woman's feet.

West and Laster determined that Plaintiff's photographs of Darnell and other female employees violated company policy. Based upon the evidence, they concluded that Plaintiff intentionally photographed Darnell from under the table. They found the allegations by Darnell and Bumgarner to be truthful, and that Plaintiff's actions violated the company's harassment policy.

On September 21, 2011, West, Laster and Plaintiff's direct supervisor Kim Absher met with him and notified him that he was being terminated. They advised Plaintiff that he was terminated for:

    1.    "the use of a record device (camera phone) on Tyson property, which is a violation of the policy."

2. "taking pictures under the table (no matter what Emko intent was), which is a violation of the Tyson Harassment Policy."

3. "the statements from other team members regarding Emko's touching, hugging and unwanted advances were a violation of the Tyson Harassment Policy."

Doc. 35 at 10. After being notified of his termination, Plaintiff told West, Laster and Absher about two incidents involving Darnell. Doc. 35-1 at 96-99. He had once told his co-workers about being in a concentration camp twenty years ago because of his Muslim faith. Darnell told him that Muslims were the cause of a lot of problems and he needed to go back where he came from. The second incident happened outside during a break at the picnic tables with another co-worker, Sharisse Triplett. Plaintiff said Darnell became angry with him and said that she would get him back. West asked Plaintiff why he had not reported the incidents. Plaintiff replied that he tried to get along with everyone.

Plaintiff filed an EEOC Charge on or about October 27, 2011, alleging discrimination based on religion and citing his September 21, 2011 termination. Doc. 26 at ¶ 10. In his EEOC Charge, Plaintiff identified September 21, 2011, as both the earliest and the last date of discrimination. Id. at Ex. 2. A Dismissal and Notice of Right to Sue letter was issued on April 30, 2013. Id. at Ex 3.

Plaintiff filed suit in this Court on July 12, 2013. Doc. 1. On September 19, 2013, the Parties filed the "Joint Stipulation of Consent to Exercise Jurisdiction by a United States Magistrate Judge." Doc. 20. Plaintiff filed an Amended Complaint on October 9, 2013. Doc. 26. Defendants filed their Answer on October 25, 2013. Doc. 27. On April 14, 2014, Plaintiff and Defendants filed a joint stipulation of dismissal with prejudice as to Plaintiff's second cause of action for national origin discrimination under Title VII, fourth cause of action alleging negligent training and supervision, and third

cause of action, in part, as to Plaintiff's claim for public policy wrongful discharge based upon national origin. Doc. 31.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The Rule provides procedures for establishing the presence or absence of any genuine dispute as to any material fact:

> (c) Procedures.
>
>> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>>
>>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>>
>>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>>
>> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

Although the moving party bears the initial burden of stating the basis for its motion and identifying what evidence demonstrates the absence of a genuine issue of material fact, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The facts must be viewed in the light most favorable to the non-moving party, and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Ricci v. DeStefano, 557 U.S. 557, 585 (2009) (citations omitted).

"The nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Coleman v. United States, 369 F. App'x 459, 461 (4th Cir. 2010) (citing Baber v. Hosp. Corp. of Am., 977 F.2d 872, 875 (4th Cir.1992)). The party asserting that a fact cannot be or is genuinely disputed must cite to particular materials in the record, including depositions, documentary evidence, affidavits and declarations. Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

## B. Religious Discrimination Claim under Title VII

Plaintiff's first claim is for religious discrimination under Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e et seq. Title VII makes it "an unlawful employment practice for an employer . . . to . . . discharge any individual . . . because of," inter alia, an individual's "religion." 42 U.S.C. § 2000e-2(a)(1). Defendants argue that Plaintiff has no direct evidence of religious discrimination on their part and therefore, he must proceed under the "pretext" proof scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85, n.2 (4th Cir. 2004), cert. denied, 543 U.S. 1132 (2005). Under the "pretext" framework, a plaintiff must establish a prima facie case of discrimination by showing, by a preponderance of the evidence, that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or he was replaced by someone outside his protected class. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310-11 (1996); Hill at 285.

If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The employer's burden is one of production, not persuasion. Hill at 285. If the employer meets this burden of production "the McDonnell Douglas framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [i]s discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43 (internal citations omitted). The plaintiff's burden to establish pretext merges with his ultimate burden of persuasion, which remains with the

plaintiff throughout the McDonnell Douglas analysis. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167,(2009); Lettieri v. Equant Inc., 478 F.3d 640, 646-47 (4th Cir. 2007).

Plaintiff concedes that he "would not prevail against [Defendants] in the context of a standard burden shifting analysis." Doc. 38 at 14. Instead, Plaintiff "rests his theory of the case on the doctrine of 'cat's paw' liability, according to which, a defendant employer may be held liable for employment decisions influenced by the discriminatory animus of a non-decision making employee." Id. Plaintiff argues that since Darnell's discriminatory animus influenced Defendants' decision to terminate him, Defendants should be held liable for that decision which violates Title VII and the public policy of North Carolina.

The Supreme Court examined the "cat's paw" theory in Staub v. Proctor Hospital, 562 U.S. ___, 131 S. Ct. 1186 (2011). Relying on principles of tort and agency law, the Court held "that if a *supervisor* performs an act motivated by antimilitary animus that is intended by the *supervisor* to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." Id. at 1194 (emphasis added). In Young v. United Parcel Service, 707 F.3d 437 (4th Cir. 2013), the Fourth Circuit characterized Staub as a case involving "non-decisionmaker colleagues whose pervasive animus for the plaintiff influenced the ultimate decisionmaker." Nonetheless, the Supreme Court was clear in its holding that liability under the "cat's paw" theory arises from actions of a "supervisor" and not a "non-decisionmaker colleague."

Darnell was not Plaintiff's supervisor. The parties agree that Darnell was a non-management employee of Defendants. Consequently, the Court finds the "cat's paw" theory of liability is not applicable here. Since Plaintiff's discrimination claim fails under the "cat's paw"

theory of liability and he concedes that he fails under the McDonnell Douglas burden shifting analysis, summary judgment is granted in favor of Defendants on Plaintiff's religious discrimination claim.

### C. Wrongful Discharge in Violation of North Carolina Public Policy Claim

Plaintiff contends that Defendants' actions also violate the public policy of North Carolina as set forth in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen.Stat. § 143–422.1, et seq. The same evidentiary standards applicable to Title VII also apply to claims based on the public policy set forth in the NCEEPA. See e.g., North Carolina Dep't. of Corr. v. Gibson, 301 S.E.2d 78 (N.C. 1983); Rishel v. Nationwide Mut. Ins. Co., 297 F.Supp.2d 854 (M.D.N.C. 2003). Plaintiff bases his NCEEPA claim on the same alleged conduct by Defendants. Since he cannot establish discrimination in violation of Title VII, his claim for wrongful discharge under the public policy set forth in NCEEPA must also fail. See Jones v. Southcorr, LLC, 324 F.Supp.2d 765, 783 (M.D.N.C.2004); Lenhart v. Gen. Elec. Co., 140 F.Supp.2d 582, 594 (W.D.N.C. 2001). Accordingly, summary judgment in favor of Defendants is also proper on this claim.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. "Defendants' Motion for Summary Judgment" (Doc. 34) is **GRANTED**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: July 8, 2014

David S. Cayer
United States Magistrate Judge